1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MARIO THOMPSON,                        No.  2:12-cv-0776 KJM DAD P

12              Plaintiff,

13        v.                                ORDER AND

14   DAVID ROSARIO,                         FINDINGS AND RECOMMENDATIONS

15              Defendant.

16

17        Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking relief under

18   42 U.S.C. § 1983.  This matter is before the court on defendant Rosario's motion for summary

19   judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff has filed

20   an opposition to the motion, and defendant has filed a reply.  For the reasons discussed herein, the

21   court will recommend that defendant's motion for summary judgment be granted.

22                                   **BACKGROUND**

23        Plaintiff is proceeding on an amended complaint in this civil rights action.  Therein,

24   plaintiff alleges that November 29, 2009, he worked as a housing unit porter in Unit Four.  His

25   assignments included removing trash from the building and sweeping and mopping floors inside

26   the building.  Defendant Rosario approached plaintiff while he was sweeping the floor and told

27   him that a fellow officer reported that plaintiff had been outside earlier.  Defendant Rosario

28   instructed plaintiff to "lock up."  Plaintiff told the defendant that he was outside removing trash

1

and admitted that he stood outside talking to a fellow inmate before returning to the building. The defendant told plaintiff to "lock up" again and denied plaintiff's request to shower first. Plaintiff asked to see the supervising sergeant and sat on a table to wait. Defendant Rosario told plaintiff that he would not call the supervising sergeant and ordered plaintiff to stand up and turn around. Plaintiff complied with defendant Rosario's order, and the defendant handcuffed him and escorted him back to his cell. (Am. Compl. Attachs. & Exs.)

Upon arrival at plaintiff's cell, defendant Rosario unlocked the door and directed plaintiff to place his hands on his head one at a time as he un-cuffed each hand. Plaintiff complied with the defendant's instructions. As plaintiff stood with both hands on his head, defendant Rosario gripped plaintiff's interlocked hands with one of his hands and opened the cell door wider. Then, the defendant allegedly shoved plaintiff in the back and caused plaintiff to stumble forward off balance and slam his right shoulder against the railing of the door jam. Defendant Rosario shut the cell door as plaintiff fell into the cell. Plaintiff later went to the prison medical clinic for evaluation of his right shoulder. According to plaintiff, he has continued to suffer pain in his right shoulder for years as a result of the defendant's conduct. (Am. Compl. Attachs. & Exs.)

## SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically store information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden

1  of proof at trial, "the moving party need only prove that there is an absence of evidence to support

2  the nonmoving party's case."  Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.).

3  See also Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after

4  adequate time for discovery and upon motion, against a party who fails to make a showing

5  sufficient to establish the existence of an element essential to that party's case, and on which that

6  party will bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.  "[A] complete failure

7  of proof concerning an essential element of the nonmoving party's case necessarily renders all

8  other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so

9  long as whatever is before the district court demonstrates that the standard for entry of summary

10 judgment, . . ., is satisfied."  Id. at 323.

11      If the moving party meets its initial responsibility, the burden then shifts to the opposing

12 party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

13 Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

14 existence of this factual dispute, the opposing party may not rely upon the allegations or denials

15 of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

16 admissible discovery material, in support of its contention that the dispute exists.  See Fed. R.

17 Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the

18 fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

19 governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

20 Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

21 genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

22 party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

23      In the endeavor to establish the existence of a factual dispute, the opposing party need not

24 establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

25 dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

26 trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

27 the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

28 Matsushita, 475 U.S. at 587 (citations omitted).

1       "In evaluating the evidence to determine whether there is a genuine issue of fact," the

2  court draws "all reasonable inferences supported by the evidence in favor of the non-moving

3  party." Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  It is

4  the opposing party's obligation to produce a factual predicate from which the inference may be

5  drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

6  aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

7  party "must do more than simply show that there is some metaphysical doubt as to the material

8  facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

9  nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation

10  omitted).

## OTHER APPLICABLE LEGAL STANDARDS

11

12  I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983

13       The Civil Rights Act under which this action was filed provides as follows:

14
> Every person who, under color of [state law] . . . subjects, or causes
> to be subjected, any citizen of the United States . . . to the

15
> deprivation of any rights, privileges, or immunities secured by the
> Constitution . . . shall be liable to the party injured in an action at

16
> law, suit in equity, or other proper proceeding for redress.

17  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

18  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

19  Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

20  (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

21  meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

22  omits to perform an act which he is legally required to do that causes the deprivation of which

23  complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

24       Moreover, supervisory personnel are generally not liable under § 1983 for the actions of

25  their employees under a theory of respondeat superior and, therefore, when a named defendant

26  holds a supervisorial position, the causal link between him and the claimed constitutional

27  violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979);

28  Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations

1    concerning the involvement of official personnel in civil rights violations are not sufficient.  See

2    Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

3    II.   The Eighth Amendment and Excessive Use of Force

4            The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S.

5    Const. amend. VIII.  The "unnecessary and wanton infliction of pain" constitutes cruel and

6    unusual punishment prohibited by the United States Constitution.  Whitley v. Albers, 475 U.S.

7    312, 319 (1986).  See also Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429

8    U.S. 97, 105-06 (1976).  Neither accident nor negligence constitutes cruel and unusual

9    punishment, as "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that

10   characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."  Whitley, 475

11   U.S. at 319.

12           What is needed to show unnecessary and wanton infliction of pain "varies according to

13   the nature of the alleged constitutional violation."  Hudson v. McMillian, 503 U.S. 1, 5 (1992)

14   (citing Whitley, 475 U.S. at 320).  To prevail on an Eighth Amendment claim the plaintiff must

15   show that objectively he suffered a "sufficiently serious" deprivation.  Farmer, 511 U.S. at 834;

16   Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).  The plaintiff must also show that subjectively

17   each defendant had a culpable state of mind in allowing or causing the plaintiff's deprivation to

18   occur.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

19           "[W]henever prison officials stand accused of using excessive physical force in violation

20   of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley,

21   i.e., whether force was applied in a good-faith effort to maintain or restore discipline, or

22   maliciously and sadistically to cause harm."  Hudson, 503 U.S. at 6-7.  The court should consider

23   several factors to determine whether a use of force violates the Eighth Amendment, including the

24   need for force, the relationship between the need for force and the amount of force used, and the

25   extent of the threat the officers reasonably perceived the plaintiff posed.  See Whitley, 475 U.S. at

26   321.  A prisoner is not required to show a "significant injury," see Hudson, 503 U.S. at 9-10, but

27   "an inmate who complains of a 'push or shove' that causes no discernible injury almost certainly

28   fails to state a valid excessive force claim."  Wilkins v. Gaddy, 559 U.S. 34, 38 (2010).

1                                                   **ANALYSIS**

2        Counsel on behalf of defendant Rosario has moved for summary judgment on plaintiff's

3 excessive use of force claim on the grounds that the evidence establishes that defendant Rosario

4 used de minimis force, if any, on the day in question resulting in a very minor injury to plaintiff.

5 (Def.'s Mem. of P. & A. at 8-11.)  Based on all of the evidence presented in connection with the

6 pending motion for summary judgment, and for the reasons stated below, the undersigned

7 concludes that defendant Rosario is entitled to summary judgment in his favor.  See Wilkins, 559

8 U.S. at 37-38 (a de minimis use of physical force is not recognized as a form of cruel and unusual

9 punishment prohibited by the Eighth Amendment).

10        First, the court finds that that defendant Rosario has borne the initial responsibility of

11 demonstrating that no reasonable juror could conclude that he used excessive force against

12 plaintiff in violation of the Eighth Amendment.  Defendant Rosario has submitted statement of

13 undisputed facts supported by declarations signed under penalty of perjury by defendant Rosario,

14 Officer J. Miller, and Sergeant C. Primm.  Defendant's statement of undisputed facts is also

15 supported by citations to a copy plaintiff's deposition transcript and copies of various documents

16 from plaintiff's central file.  The evidence submitted by the defendant in support of his motion for

17 summary judgment establishes the following.

18        At all relevant times to this suit, plaintiff was an inmate at California State Prison, Solano

19 ("CSP-Solano").  At all relevant times, defendant Rosario was a correctional officer at CSP-

20 Solano.  On November 29, 2009, plaintiff was housed on the upper tier in Unit Four, Facility I,

21 Cell 236.  During the second watch from 6:00 a.m. to 2:00 p.m., defendant Rosario was working

22 as a housing unit officer, J. Miller was working as a correctional officer, and C. Primm was

23 working as a correctional sergeant in Unit Four, Facility I.  During the third watch from 2:00 p.m.

24 to 10:00 p.m., Sergeant Primm was working as the correctional sergeant in the medical area.

25 (Def.'s SUDF 1-6, Rosario Decl., Miller Decl., Primm Decl., Pl.'s Dep. & Am. Compl.)

26        As housing unit officers, defendant Rosario and Officer Miller had a wide variety of

27 duties, including ensuring the safe operation of the housing area, conducting searches, supervising

28 inmate movement, responding to emergencies, conducting institutional and close custody counts,

1   instructing inmates on proper behavior, ensuring inmates do not violate rules or regulations, and

2   supervising the inmate workers.  (Def.'s SUDF 7, Rosario Decl. & Miller Decl.)

3          On the day in question, plaintiff was working as an inmate porter in Unit Four, Facility I.

4   His duties included sweeping, mopping, taking out the trash, cleaning, taking food trays to

5   inmates, and performing other tasks housing unit officers assigned him at the time.  Plaintiff's

6   shift as a porter typically started around 7:00 a.m. and ended at approximately 2:00 p.m.

7   According to plaintiff, he usually needed ten to fifteen minutes to complete his tasks.  (Def.'s

8   SUDF 8-9, Pl.'s Dep. & Am. Compl.)

9          Housing unit officers supervised the inmate porters and other inmate workers in the

10   housing unit.  Housing unit officers assigned the inmate workers tasks, ensured that the inmates

11   completed their daily tasks, and completed inmate time cards and other work assignment related

12   paperwork.  Other than the times plaintiff alleges in his complaint, plaintiff did not have any

13   problems or issues with defendant Rosario's supervision as a housing unit officer.  (Def.'s SUDF

14   10-11, Rosario Decl., Miller Decl., Pl.'s Dep.)

15          Housing unit officers conduct a close custody count of inmates classified as Close A at

16   12:00 p.m. after prison officials recall inmates to the building from the yard and dayroom at

17   approximately 11:45 a.m.  All Close A inmates must return to their cells, and the housing unit

18   officers must identify them.  During recalls and counts there is a great deal of inmate movement

19   and activity, and there are typically only two housing officers and a control booth officer in the

20   housing unit to ensure that the recall and counts are completed safely and accurately.  There is so

21   much movement at this time, that it makes any distraction by an inmate dangerous.  Inmate

22   distractions can potentially lead to an inaccurate or untimely count or a failure to observe another

23   threat in the housing unit.  (Def.'s SUDF 12-13, Rosario Decl., Miller Decl.)

24          In November 2009, there were approximately 200 inmates in the housing unit, and

25   approximately 100 of them would have yard time while the other 100 had dayroom time.  During

26   recalls and counts, all 200 inmates are in the housing unit and secured.  The inmates are then

27   released for dayroom or yard time depending on whether they had dayroom or yard time in the

28   morning.  On November 29, 2009, prison officials required all inmates to return to their cells for

7

1    the 11:45 a.m. recall and 12:00 p.m. close custody count before they could go out for their

2    assigned afternoon yard or dayroom program.  Prison officials required inmates to lock up at this

3    time because the housing unit staff needed to leave the unit to assist another housing unit with

4    unlock procedures.  (Def.'s SUDF 14-15, Rosario Decl., Miller Decl.)

5           Just before the 11:45 a.m. recall, plaintiff was performing his duties as a porter and went

6    out on the yard to take out the garbage.  While plaintiff was on the yard, he stopped and spoke to

7    another inmate probably about gambling, although plaintiff could not recall the conversation.  A

8    correctional officer approached plaintiff and told him that only yard workers were allowed on the

9    yard.  Plaintiff was only supposed to be emptying the trash.  Plaintiff did not tell the correctional

10   officer what he was doing when she approached him regarding his presence in the yard.  After

11   being confronted on the yard, plaintiff returned to his housing unit and started sweeping again.

12   (Def.'s SUDF 16-17, 20 & 22, Pl.'s Dep. & Am. Compl.)

13          Inmates who are on the yard at an improper time present a safety and security risk because

14   prison officials cannot account for them in their assigned building, and they can distract yard staff

15   from supervising the inmates on the yard.  Housing staff also may have to suspend the

16   performance of their duties to find and account for the inmate.  Inmates who are not performing

17   their job duties, and who are on the yard when they are not supposed to be, are subject to

18   discipline.  Previously, plaintiff has gotten into trouble for being on the yard at an improper time.

19   Specifically, on November 4, 2009, plaintiff was on the yard speaking with other inmates when

20   he was supposed to be in his housing unit.  As a result, plaintiff received a Rules Violation Report

21   for his job performance and for violation state regulations.  (Def.'s SUDF 18-19 & 21 Rosario

22   Decl., Miller Decl., Primm Decl., Pl.'s Dep. & Am. Compl.)

23          At the 11:45 a.m. recall on the day in question, plaintiff contends that defendant Rosario

24   approached him and told him to "lock it up" in his cell because he was on the yard talking to

25   another inmate.  Plaintiff refused to immediately return to his cell when ordered and instead asked

26   to take a shower.  Inmate workers do not have a set time for the taking of their showers.  Rather,

27   correctional staff provides inmate workers with showers at a time that is convenient for

28   correctional staff and compatible with the housing unit schedule and activities.  Typically, inmate

8

workers shower after their shift ends.  Plaintiff did not care when he received a shower so long as he received a shower at some point during the day.  At no time did defendant Rosario tell plaintiff that he would not receive a shower for the entire day.  (Def.'s SUDF 23-28, Rosario Decl., Miller Decl., Pl.'s Dep. & Am. Compl.)

Defendant Rosario ordered plaintiff to lock up again, but plaintiff refused and asked to speak to a sergeant.  It is common for inmates to ask to speak to a sergeant or supervisor about non-emergent issues.  Sergeants and supervisors are not always available to immediately respond to non-emergent requests because they have their own duties to attend to throughout the facility.  Correctional officers are not required to get a sergeant every time an inmate requests one.  Officers are encouraged to handle non-emergent issues themselves.  Recalls and counts cannot be suspended for every inmate request to speak to a sergeant.  Inmate requests regarding showers do not require a sergeant's immediate attention.  (Def.'s SUDF 29-31, Rosario Decl., Primm Decl., Pl.'s Dep. & Am. Compl.)

According to defendant Rosario, plaintiff was acting belligerently.  Instead of immediately locking up and returning to his cell as ordered, plaintiff sat down on a table in the dayroom.  Inmates are required to follow direct orders from correctional officers.  Inmates who refuse to follow direct orders are subject to discipline because state regulations require all inmates to promptly obey verbal orders and instructions from correctional staff.  Plaintiff knew that he was supposed to follow direct orders and that he could be disciplined and receive a Rules Violation Report for refusing to follow the order to return to his cell.  (Def.'s SUDF 32-35, Rosario Decl., Pl.'s Dep. & Am. Compl.)

Any time an inmate refuses a direct order from correctional staff, a safety and security concern to the staff and inmates can arise.  It is unclear how the inmate will react when the officers attempt to get the inmate to comply with orders.  In addition, the inmate's refusal to follow orders causes correctional staff to suspend the performance their other duties and focus solely on gaining that inmate's compliance.  This can distract the officers from other potentially dangerous situations in the housing unit.  (Def.'s SUDF 36, Rosario Decl., Miller Decl., Primm Decl.)

1    Eventually, plaintiff turned around and allowed defendant Rosario to place handcuffs on
2    him.  It is appropriate to use handcuffs to escort an inmate back to his cell when the inmate is
3    refusing direct orders to return to his cell and lock-up.  After defendant Rosario handcuffed
4    plaintiff, he escorted him back to his cell with Officer Miller.  Officer Miller never exercised
5    physical control of plaintiff.  Defendant Rosario and Officer Miller did not say or do anything to
6    plaintiff while they escorted him back to his cell.  Plaintiff might have been mumbling while he
7    was being escorted back to his cell.  (Def.'s SUDF 38-42, Rosario Decl., Miller Decl., Pl.'s Dep.
8    & Am. Compl.)

9    When they reached plaintiff's cell, he was placed against the wall and told to spread his
10   legs.  Plaintiff was placed just inside the cell door.  Defendant Rosario took plaintiff's handcuffs
11   off by telling him to place his hands on the back of his head as the handcuffs were released.
12   Plaintiff's cell door was then closed.  According to defendant Rosario, he did not shove plaintiff
13   into his cell and did not use force with the intent to cause plaintiff harm.  The defendant's actions
14   on November 29, 2009, were motivated by a desire to preserve the safety and security of the staff
15   and inmates in the housing unit.  (Def.'s SUDF 43-46, 48-49, Rosario Decl., Miller Decl., Pl.'s
16   Dep. & Am. Compl.)

17   Defendant Rosario's custom and practice in 2009, just as today, was to conduct
18   handcuffed escorts to cells the same way.  He would handcuff the inmate behind his back and
19   escort him back to the cell.  The inmate would then be placed just inside the door so that he could
20   safely be un-cuffed and minimize the risk of assault.  He would then release one hand at a time
21   and have the door closed.  (Def.'s SUDF 47, Rosario Decl.)

22   Plaintiff alleges that defendant Rosario pushed him back into his cell and he stumbled
23   forward through the door and hit the top back of his right shoulder on the rail of the door.
24   Plaintiff concedes that he did not actually fall to the ground.  After the cell door was closed,
25   plaintiff was "pissed off," called defendant Rosario a few names, yelled "What the hell are you
26   doing this for, punk" and started kicking the door and shouting angrily at defendant Rosario.
27   Plaintiff continued to kick the door and yell angrily for ten to thirty minutes.  Defendant Rosario
28   /////

1    did not say anything to plaintiff after he was in his cell.  (Def.'s SUDF 50-53, Rosario Decl., Pl.'s

2    Dep. & Am. Compl.)

3          At some point around the 12:00 p.m. close custody count, correctional sergeant Primm

4    was making his rounds to all of the housing units on Facility I.  Sergeant Primm was informed

5    that there was an issue with plaintiff.  Sergeant Primm went to plaintiff's cell to speak with him

6    about the issue.  When Sergeant Primm arrived at plaintiff's cell, he removed plaintiff from the

7    cell and took him outside the building to speak to him.  Plaintiff stated that he wanted to retaliate

8    against defendant Rosario by getting him in the gym and fighting him.  Plaintiff admitted to

9    Sergeant Primm that he went outside in the yard to empty the trash and stopped to speak to other

10   inmates at a time when he was not allowed to be out on the yard speaking to other inmates.

11   Sergeant Primm told plaintiff that he should not have stopped to speak to other inmates while he

12   was out on the yard.  During this conversation, plaintiff did not tell Sergeant Primm that

13   defendant Rosario pushed him, did not have any apparent injuries, and did not complain about

14   suffering from any pain.  Plaintiff agreed that he was going to drop the issue with defendant

15   Rosario after he spoke to Sergeant Primm.  Plaintiff did not ask for medical attention.  (Def.'s

16   SUDF 54-61, Primm Decl., Pl.'s Dep.)

17         After plaintiff's conversation with Sergeant Primm, plaintiff learned that he had a visitor.

18   Later, plaintiff saw Sergeant Primm again when he sought medical attention.  At that time,

19   Sergeant Primm was working as the sergeant in the medical area.  He asked plaintiff why he was

20   in medical, and plaintiff responded that defendant Rosario pushed him and hurt his shoulder.

21   Plaintiff alleges that he suffered a one to two inch horizontal scratch on the top of his right

22   shoulder.  The scratch did not bleed and did not require any stitches.  He only reported having a

23   little burning pain.  (Def.'s SUDF 62-65, Primm Decl., Pl.'s Dep.)

24         Nurse McDonald treated plaintiff.  Nurse McDonald completed paperwork and reported

25   that plaintiff's only injury was a minor scratch.  Plaintiff does not recall whether he received any

26   other medical treatment for the cut or scratch at the time.  Since the incident no medical

27   professional, however, has diagnosed any of plaintiff's medical issues as having been caused by

28   the alleged push which is the subject of this action.  In addition, no medical official has stated that

1  medical treatment plaintiff has received since November 29, 2009, is for injuries from defendant

2  Rosario's alleged push.  Plaintiff has not had any problems or issues with defendant Rosario since

3  the alleged incident on November 29, 2009.  (Def.'s SUDF 66-68, Pl.'s Dep. & Am. Comp.)

4          Given the evidence submitted by defendant Rosario in support of the pending motion for

5  summary judgment, the burden shifts to plaintiff to establish the existence of a genuine issue of

6  material fact with respect to his excessive use of force claim.  On defendant's motion for

7  summary judgment, the court is required to believe plaintiff's evidence and draw all reasonable

8  inferences from the evidence before the court in plaintiff's favor.  The court has reviewed

9  plaintiff's verified complaint and his opposition to defendant's motion.  Drawing all reasonable

10  inferences in plaintiff's favor, the court concludes that plaintiff has not submitted sufficient

11  evidence on summary judgment to create a genuine issue of material fact with respect to his claim

12  that defendant Rosario violated his rights under the Eighth Amendment.

13          As discussed above, in excessive force cases, the "core judicial inquiry" is "whether force

14  was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically

15  to cause harm."  Hudson, 503 U.S. at 7.  See also Whitley, 475 U.S. at 321 (court should consider

16  factors, including the need for force, the relationship between the need for force and the amount

17  of force used, and the extent of the threat the officers reasonably perceived the plaintiff posed).

18  However, it has been recognized by the Supreme Court that "not every malevolent touch by a

19  prison guard gives rise to a federal cause of action."  Wilkins, 559 U.S. at 37.  The Eighth

20  Amendment's prohibition on cruel and unusual punishments "necessarily excludes from

21  constitutional recognition de minimis uses of physical force, provided that the use of force is not

22  of a sort repugnant to the conscience of mankind."  Id. at 37-38.  In this regard, "[a]n inmate who

23  complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a

24  valid excessive force claim."  Id. at 38.

25          In this case, even accepting plaintiff's version of the facts that defendant Rosario shoved

26  him in the back and caused him to stumble across the cell door threshold and make contact with

27  the metal frame of the door, the court finds that defendant Rosario's alleged shove was indeed a

28  "de minimis use of physical force . . . not of a sort repugnant to the conscience of mankind."

1 | Wilkins, 559 U.S. at 37.  Two recent district court decisions addressing complaints based on

2 | similar allegations are instructive.  See Royal v. Knight, No. 1:09-cv-01407 BAM (PC), 2013 WL

3 | 6835188 (E.D. Cal. Dec. 20, 2013); Washington v. Duncan, No. C 05-2775 WHA (PR), 2011 WL

4 | 2020703 (N.D. Cal. May 24, 2011).

5 |       In Washington, a prisoner-plaintiff brought an excessive use of force claim against

6 | correctional officer Moore because the officer allegedly shoved the plaintiff into a fence without

7 | provocation.  See Washington v. Duncan, No. C 05-2775 WHA (PR), 2011 WL 2020703 (N.D.

8 | Cal. May 24, 2011).  According to the plaintiff's version of the facts in that case, prison officials

9 | had ordered plaintiff to transfer from his cell to a new cell.  Id. at *2.  Initially, plaintiff refused to

10 | move or to pack his property but eventually agreed to do so.  Id.  The defendant was one of

11 | several officers assigned to escort plaintiff to his new cell.  Id.  An Officer Pena placed plaintiff in

12 | handcuffs in front of plaintiff's body because plaintiff walked with a cane.  Id.  Plaintiff wanted to

13 | pack more property before the cell move, however, and yelled expletives at Officer Pena.  Id.

14 | The defendant approached plaintiff and calmed him down and escorted him to his new cell while

15 | holding his arm.  Id.  When they arrived at plaintiff's new facility, the sally-port gate was locked.

16 | Id.  According to plaintiff, defendant Moore "shoved" plaintiff against a fence "with force" such

17 | that he "bounced" backwards.  Id.  Plaintiff maintained that he did not provide any resistance,

18 | engage in any furtive movements or make any derogatory statements before the defendant shoved

19 | him.  Id.  Plaintiff was immediately taken to see a nurse who found an "abrasion/scratch" on both

20 | his cheek and his knuckle.  Id.

21 |       The case came before the court on defendant Moore's motion for summary judgment.  See

22 | Washington, 2011 WL 2020703.  The court determined that, even if plaintiff's allegations that he

23 | was pushed against the fence without provocation were true, defendant Moore used de minimis

24 | force.  Id. at *2.  The court explained that, at worst, the defendant shoved plaintiff a single time,

25 | causing only a scratch or abrasion on plaintiff's cheek and hand.  Id.  Such a slight injury, the

26 | court explained, indicated that the defendant applied a relatively small amount of force.  Id.  In

27 | this regard, the court determined that the defendant's pushing plaintiff a single time against a

28 | chain-link fence without a great deal of force, even if true, was not "of a sort repugnant to the

1    conscience of mankind" and therefore did not rise to the level of an Eighth Amendment violation.

2    Id.  Accordingly, the court granted the defendant summary judgment in the defendant's favor

3    with respect to plaintiff's excessive use of force claim.  Id.

4          Similarly, in Royal, a prisoner-plaintiff brought an excessive use of force claim against

5    correctional officer Knight because he allegedly shoved plaintiff into a cell frame.  See Royal v.

6    Knight, No. 1:09-cv-01407 BAM (PC), 2013 WL 6835188 (E.D. Cal. Dec. 20, 2013).  According

7    to the plaintiff's allegations, defendant Knight located three boxes of plaintiff's property and

8    brought them to the Facility D office for plaintiff.  Id. at *2-3.  Defendant Knight asked the

9    control booth officer to let plaintiff into the office.  Id.  After looking at the property, plaintiff told

10   defendant Knight that his television was missing.  Id.  Plaintiff and defendant then exchanged

11   words, and defendant Knight ordered plaintiff to go back to his cell.  Id. at *2-4.  Plaintiff

12   complied with the order, but defendant Knight grabbed plaintiff's right shoulder and pushed him

13   into the cell frame, causing plaintiff pain to his shoulder, neck, head, and back.  Id. at *2.  On the

14   following day, plaintiff went to the prison medical clinic and saw a nurse.  Plaintiff complained

15   that he could not control his breathing because defendant Knight had pushed him.  Id. at *4.  The

16   nurse did not observe plaintiff wheezing or experiencing shortness of breath and did not observe

17   any bruising or a dislocation in the area of plaintiff's shoulder.  Id.  In addition, x-rays of

18   plaintiff's shoulder were negative for any acute fracture or dislocation.  Id.

19         The case came before the court on defendant Knight's motion for summary judgment.  Id.

20   at *1.  The court determined that, even if the defendant had pushed plaintiff into the cell frame as

21   plaintiff alleged, defendant Knight's use of force was de minimis and did not rise to the level of a

22   constitutional violation.  Id. at *8.  The court noted that, at most, the defendant had pushed

23   plaintiff a single time and that act did not result in bruising or other discernible injury.  Id.  The

24   court found plaintiff did not raise a genuine dispute of material fact by asserting that he suffered a

25   shoulder injury and by referencing pain medication and his shoulder popping out of place because

26   plaintiff had not come forward with any medical records in support of such assertions.  Id.  The

27   court noted that the medical records plaintiff had submitted identified a one-time prescription for

28   Ibuprofen and the absence of any physical injury to his shoulder.  Id.  The court concluded that

1   defendant Knight's single push, which did not result in an injury, failed to rise to the level of an

2   Eighth Amendment violation.  Id.  Accordingly, the court granted the defendant summary

3   judgment on plaintiff's excessive use of force claim.  Id.  See also Turner v. Brazelton, 13cv1727

4   DLB PC, 2014 WL 1123817, at *3 (E.D. Cal. Mar. 20, 2014) (dismissing a complaint for failure

5   to state a claim where the plaintiff alleged that the defendant correctional officer "came up from

6   behind [him] and sock[ed] [him] in the back with such a force that it almost made [him] fall")

7            Here, plaintiff's case is indistinguishable from those presented in Washington and Royal.

8   Similar to those cases, at issue here is an allegation involving defendant Rosario's single shove

9   that resulted in an abrasion to the back of plaintiff's right shoulder.  As the court in Washington

10  noted, an injury consisting solely of a scratch or abrasion indicates the use of "a relatively small

11  amount of force."  Washington, 2011 WL 2020703, at *2 (citing Wilkins, 559 U.S. at 37-38).  In

12  addition, although plaintiff contends that he has suffered chronic shoulder problems for years as a

13  result of defendant Rosario's single push, he has not presented any evidence in support of his

14  contentions in that regard.  Just as the court in Royal concluded, this court finds that plaintiff's

15  assertion of any ongoing physical injury to his shoulder without coming forward with any

16  corroborating medical records or evidence reveals a failure to raise a genuine dispute of material

17  fact sufficient to survive defendant's motion for summary judgment.

18           Accordingly, the court concludes that defendant Rosario is entitled to summary judgment

19  in his favor on plaintiff's Eighth Amendment excessive use of force claim.  In light of this

20  conclusion, the court declines to address defendant's alternative argument based on the

21  affirmative defense of qualified immunity or defendant's objections to the evidence presented by

22  plaintiff in opposition to summary judgment.

23                                    **OTHER MATTERS**

24           Plaintiff has filed a motion for appointment of counsel.  The United States Supreme Court

25  has ruled that district courts lack authority to require counsel to represent indigent prisoners in §

26  1983 cases.  Mallard v. United States Dist. Court, 490 U.S. 296, 298 (1989).  In certain

27  exceptional circumstances, the district court may request the voluntary assistance of counsel

28  pursuant to 28 U.S.C. § 1915(e)(1).  Terrell v. Brewer, 935 F.2d 1015, 1017 (9th Cir. 1991);

1 | <u>Wood v. Housewright</u>, 900 F.2d 1332, 1335-36 (9th Cir. 1990).

2 |        The test for exceptional circumstances requires the court to evaluate the plaintiff's

3 | likelihood of success on the merits and the ability of the plaintiff to articulate his claims pro se in

4 | light of the complexity of the legal issues involved.  <u>See</u> <u>Wilborn v. Escalderon</u>, 789 F.2d 1328,

5 | 1331 (9th Cir. 1986); <u>Weygandt v. Look</u>, 718 F.2d 952, 954 (9th Cir. 1983).  Circumstances

6 | common to most prisoners, such as lack of legal education and limited law library access, do not

7 | establish exceptional circumstances that would warrant a request for voluntary assistance of

8 | counsel.  In light of the findings and recommendations set forth herein, the court does not find the

9 | required exceptional circumstances.

10 | **CONCLUSION**

11 |        Accordingly, IT IS HEREBY ORDERED that plaintiff's motion for appointment of

12 | counsel (Doc. No. 43) is denied; and

13 |        IT IS HEREBY RECOMMENDED that:

14 |     1. Defendant Rosario's motion for summary judgment (Doc. No. 34) be granted; and

15 |     2. This action be closed.

16 |        These findings and recommendations are submitted to the United States District Judge

17 | assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

18 | after being served with these findings and recommendations, any party may file written

19 | objections with the court and serve a copy on all parties.  Such a document should be captioned

20 | "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

21 | objections shall be filed and served within fourteen days after service of the objections.  The

22 | parties are advised that failure to file objections within the specified time may waive the right to

23 | appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

24 | Dated:  April 9, 2014

25 |

26 | _____
   | DALE A. DROZD

27 | DAD:9
   | thom0776.57
   | UNITED STATES MAGISTRATE JUDGE

28 |

16